UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JONATHAN JOE JONES,                    Case No. 08-11183

        Plaintiff,                    Denise Page Hood
vs.                                    United States District Judge

KENNETH McKEE,                         Michael Hluchaniuk
                                       United States Magistrate Judge

        Defendant.
_____/

## REPORT AND RECOMMENDATION
## PETITION FOR RELIEF UNDER 28 U.S.C. § 2254

## I.    PROCEDURAL HISTORY

Petitioner Jonathan Joe Jones filed the present action, *pro se*,, on March 19, 2008, pursuant to 28 U.S.C. § 2254.  (Dkt. 3).  An answer to the petition was filed on September 26, 2008.  (Dkt. 7).  A reply to the answer was filed by petitioner on November 13, 2008.  (Dkt. 9).  The case was referred to the undersigned for all pretrial matters on September 11, 2009.  (Dkt. 13).  After consideration, and for the reasons set forth below, the undersigned **RECOMMENDS** that the petition for writ of habeas corpus be **DENIED**.

## II.   FACTUAL BACKGROUND

In August of 1998, petitioner lived at a residence on 7th Street in Saginaw, Michigan.  Also living at that residence was petitioner's girlfriend, Anita Louis,

and Julie Pryor.  (Dkt. 8-12, p. 101).  One evening in August of 1998 petitioner,

Anita Louis and an acquaintance of petitioner's, Oliver Rodell Henderson, were

watching TV at petitioner's residence.  Petitioner and Ms. Louis went to sleep

leaving Mr. Henderson watching the TV.  The next morning the TV was missing.

(Dkt. 8-12, pp. 104-05).  Subsequently, petitioner told Kim Martin, another of

petitioner's acquaintances, that he knew who had taken his TV and that "they were

going to deal with them."  (Dkt. 8-12, p. 108-09).  Petitioner told another friend

that "Rodell" had taken his TV and that he was going to "take care of it."  (Dkt. 8-

12, p. 110).

Emily Draine was Kim Martin's girlfriend and lived with him in Saginaw.

Their house was broken into in August of 1998.  Subsequently, Martin said that

"Rodell" had broken into the house.  (Dkt. 8-12, 62).  Martin stated that a VCR and

a video game, among other things, were taken in the break-in.  (Dkt. 8-12, p. 109).

Reginald Johnson also resided in Saginaw in August of 1998 and he knew

petitioner, although not by name, he knew Kim Martin and he knew "Rodell."

(Dkt. 8-12, 88-89).  On August 8, 1998, Johnson encountered "Rodell" riding what

Johnson believed to be Kim Martin's bicycle.  "Rodell" said he was going to sell a

VCR.  (Dkt. 8-12, 91-92).  Johnson, after encountering "Rodell," was concerned

that "Rodell" had broken into Martin's house and informed Martin's sister,

Deborah, of what he had seen.  (Dkt. 8-12, pp. 92-94).  Kim Martin later

approached Johnson and discussed Johnson's observation of "Rodell" with him. *Id*.

Three days later, on August 11, 1998, Ricky Jones was going home in the early morning hours and saw two people fighting. One of those individuals was Kim Martin, who was familiar to Ricky Jones because they had grown up together. (Dkt. 8-12, pp. 10-12). The other individual was later identified as Oliver Rodell Henderson. Ricky Jones heard Martin say to Henderson "why did you break in my house"? (Dkt. 8-12, p. 13). Henderson broke away from Martin but Martin had a hold on his shirt and he "came out of" the shirt in his attempt to get away. (Dkt. 8-12, pp. 14-15). Martin shouted at Ricky Jones to "stop" the shirtless Henderson, but Jones had a physical disability that made it difficult for him to run. (Dkt. 8-12, p. 14).

Martin caught up to Henderson, knocked him down, and started kicking him in the head. (Dkt. 8-12, pp. 17-19). Martin dragged Henderson to the side of an adjacent house and continued kicking him. Ricky Jones tried to stop Martin, but to no avail. Martin kicked Henderson an estimated 20-25 times, until Henderson appeared to lose consciousness. (Dkt. 8-12, pp. 20-24). Martin then went to petitioner's house, which was near-by and knocked on the door. When petitioner came outside, Martin asked him if he "wanted a piece of this." (Dkt. 8-12, pp. 24-26). Petitioner went to where Henderson lay on the ground and "jumped" on his head 4-5 times, with both feet. (Dkt. 8-12, p. 27).

Report and Recommendation
28 U.S.C. § 2254 Petition
*Jones v. McKee*; Case No. 08-11183

Martin and petitioner then left the area and Martin returned shortly thereafter and told Ricky Jones to call the police. Jones ultimately went to the residence of a female acquaintance and called the police. (Dkt. 8-12, pp. 30-32). The police came to the area and Jones did not initially tell the police everything, but later did. (Dkt. 8-12, p. 33).

Henderson was taken to the hospital where doctors examined him and determined he had suffered "blunt trauma" to the head, which caused significant injury. (Dkt. 8-12, pp. 140-41). Henderson remained in the hospital in a coma until he died on October 28, 1998. (Dkt. 8-12, pp. 142-43). An autopsy done on Henderson in January of 1999 indicated that he died from "blunt force head trauma and complications" from those injuries. (Dkt. 8-13, p. 12).

Julie Pryor testified that she had been away from home until approximately 5:00 AM on August 11, 1998. Shortly after she returned, petitioner came back to the house and asked her if the police had been there. Pryor informed petitioner she had just returned home herself and had not seen the police, but suggested petitioner speak with Anita. After that, petitioner changed clothes and left and did not return to the house for several days. (Dkt. 8-12, p. 115). Pryor learned of the injuries to Henderson about a week after it happened and asked petitioner why he did that to Henderson. Petitioner responded by stating "because" Henderson had taken petitioner's TV. (Dkt. 8-12, p. 117). When petitioner informed Pryor of this, he

Report and Recommendation
28 U.S.C. § 2254 Petition
*Jones v. McKee*; Case No. 08-11183

did not express any remorse and acted matter-of-fact about the circumstances.
(Dkt. 8-12, p. 118).  Pryor also overheard petitioner tell another of his friends that
he had "stomped his ass," referring to what he had done to Henderson, and laughed
about it.  (Dkt.  8-12, pp. 121-23).

Following the August 11, 1998, incident, police officers executed search
warrants at petitioner's residence and Kim Martin's residence on August 16, 1998.
During the search at petitioner's residence, several items of clothing, including a
pair of green trousers, were seized.  (Dkt. 8-11, pp. 110-11).  During the search at
Kim Martin's residence, several items were seized including a pair of shoes.  (Dkt.
8-12, p.7).

Petitioner was subsequently charged with first degree murder and conspiracy
to commit murder.  Petitioner's trial began on June 22, 1999.  One of the first
witnesses for the prosecution was Mark Clark, who was a detective with the
Saginaw Police Department, and had been involved in the investigation leading up
to the prosecution of petitioner and Kim Martin.  On cross-examination, Det. Clark
was asked by defense counsel if during the interviews that had been conducted of
Ricky Jones, that Jones had given multiple versions of the events in question.
Clark gave an affirmative response to the question after which defense counsel
asked Clark if Jones had been given a polygraph exam on two occasions.  (Dkt. 8-
11, p. 116).  Before Clark could answer, an objection was made by the prosecutor

and the judge and counsel held an unrecorded side-bar conference. They came back on the record and there was no further mention of a polygraph exam at that time. However, at the conclusion of the trial that day, the prosecutor moved for a mistrial based on the defense attorney's question to Det. Clark about whether Ricky Jones had been given a polygraph examination. The trial judge indicated he thought a "curative instruction" would fix the problem and he denied the motion. (Dkt. 8-11, pp. 118-19). The record does not contain any request for a curative instruction on this issue.

The next day, during the direct examination of Ricky Jones by the prosecutor, Jones was asked if he had taken a polygraph in the case to which he responded "yes." (Dkt. 8-12, p. 33). The prosecutor then asked if Jones had passed the polygraph and Jones answered "yes" to that question as well. (Dkt. 8-12, p. 34). Defense counsel made an objection and the prosecutor responded that the issue had been "brought up yesterday." The judge sustained the objection and told the attorneys to "move on." *Id.*

The prosecution also introduced evidence that DNA samples from Henderson's blood matched blood stains on the green trousers seized at petitioner's house,[1] blood stains on Ricky Jones' shirt[2] and on Kim Martin's shoes. (Dkt. 8-16,

---

[1] The blood stain on the green trousers was described as a "soaking" stain, which suggests that the trousers were in contact with the source of the blood. This stain was approximately six inches above the bottom seam of the pant leg. (Dkt. 8-

pp. 19-20).  The green trousers were identified by Julie Pryor as belonging to

petitioner (Dkt. 8-12, p. 113) and petitioner admitted the trousers were his during

his trial testimony.  (Dkt. 8-16, p. 34).  Additionally, shoe impressions taken near

the location where Henderson was beaten were similar to the shoes seized from

Kim Martin's residence.  (Dkt. 8-14, pp. 8-9).

Petitioner testified in his own behalf at the trial and denied any involvement

in the events as described by Ricky Jones.  (Dkt. 8-16, p. 31).  Petitioner claimed

that Henderson came to his house on a regular basis and sometimes wore

petitioner's clothes. (Dkt. 6-16, p. 33).  Petitioner did not know how Henderson's

blood got on petitioner's green trousers but testified that Henderson had cut his

fingers during the week before his beating, perhaps suggesting that had been the

source of the blood on the green trousers.  (Dkt. 8-16, pp. 31-33).  Petitioner also

claimed that he really did not know Ricky Jones or Kim Martin and just saw them

around the area where he lived.  (Dkt. 8-16, pp. 39-40).

Petitioner called several witnesses as part of his defense. The testimony of

Lavana Lucille Parham was presented to the jury by reading the transcript of her

testimony from the trial against Kim Martin.  Petitioner had been unable to serve

---

12, pp. 75-78).

[2] The blood stain on the t-shirt was about the size of a "pinhead" and was
consistent with blood "spattering" when blood is cast off some object by a force
and lands on another object.  (Dkt. 8-12, p. 80).

her with a subpoena and sought to admit the transcript of her testimony from the prior trial due to her unavailability.  While the prosecutor objected to this evidence, the judge permitted it.  (Dkt. 8-16, pp. 7-8).  The testimony of Parham, for the most part, consisted of stating that Ricky Jones had called the police regarding Henderson's beating from her house and she claimed that Jones had stated that he "hoped" Henderson was "dead."  (Dkt. 8-16, p. 25).  The apparent purpose of this evidence was to discredit Jones.

David Louis and Anita Louis also testified for the defense.  David Louis stated he knew petitioner and he knew Henderson.  (Dkt. 8-13, pp. 17-18).  Louis stated he was at petitioner's residence on a regular basis because his sister, Anita Louis, was petitioner's "spouse."  *Id.*  During the summer of 1998 Louis stated that Henderson was at petitioner's residence "frequently."  *Id.*  Anita Louis testified she was petitioner's girlfriend, she lived at the residence with him and she was present at the house on August 11, 1998.  She did not recall petitioner doing anything with Kim Martin that night.  (Dkt. 8-13, pp. 27-29).  The remaining defense witness was Wendy Blackmon who testified that she had a "relationship" with petitioners' son, that she knew Julie Pryor, but had never been to the casino with her.  (Dkt. 8-13, pp. 24-25).  This testimony was apparently offered to contradict Pryor's testimony that she had gone to a casino with Blackmon.  (Dkt. 8-12, p. 132).

## III.   STATE PROCEDURAL HISTORY

Petitioner was initially charged on September 23, 1998.  (Dkt. 8-2, p. 1). The trial in his case started on June 22, 1999 and concluded on July 1, 1999, with petitioner being found guilty of first degree premeditated murder and conspiracy to commit murder.  (Dkt. 8-2, p. 5).  On July 26, 1999, petitioner was sentenced to the mandatory life sentence required for the offense of which he was convicted.  (Dkt. 8-17, pp. 2-3).

Petitioner sought a direct appeal from his conviction raising four issues.  The issues were (1) prosecutorial misconduct relating to the prosecutor's questions to Ricky Jones about the polygraph test, (2) sufficiency of the evidence as to premeditation, (3) sufficiency of the evidence as to conspiracy, and (4) error by the trial court regarding the admission of autopsy photographs because the photographs were substantially more prejudicial than probative and deprived petitioner of a fair trial.  (Dkt. 8-20, pp. 6-33).  The Michigan Court of Appeals reversed petitioner's conviction on July 17, 2001, stating the admission of the evidence relating to Ricky Jones passing a polygraph was plain error and that the error was not harmless due to the importance of Jones to the prosecution's case. The Court of Appeals remanded the case for a new trial and also found that sufficient evidence of premeditation and conspiracy had been offered during the first trial.  The court did not address the claim relating to the admission of the autopsy photographs.  (Dkt. 8-20, pp. 3-5).

Report and Recommendation
28 U.S.C. § 2254 Petition
*Jones v. McKee*; Case No. 08-11183

The prosecution sought leave to appeal the decision of the Court of Appeals to the Michigan Supreme Court and leave was granted on April 12, 2002. (Dkt. 8-19, p. 1). On June 11, 2003, the Michigan Supreme Court reversed the decision of the Court of Appeals, reinstated the conviction and remanded the case back to the Court of Appeals to address the unresolved claim regarding the admission of the autopsy photographs. The Supreme Court concluded that, while the conduct of the prosecutor was error, the conduct was provoked by the actions of defense counsel when he asked Det. Clark if a polygraph examination had been given to Jones, thus suggesting Jones had failed the examination, and therefore the doctrine of "invited response" could be considered in deciding the case. When that doctrine was considered, along with the "substantial evidence" corroborating Jones' testimony, reversal of the conviction was not required. (Dkt. 8-20, pp. 70-94).

The Court of Appeals, on remand, denied petitioner's claim relating to the admission of the autopsy photographs on August 19, 2003. Petitioner sought leave to appeal that decision of the Court of Appeals to the Supreme Court and leave was denied on January 27, 2004. (Dkt. 8-20, p. 1).

Petitioner then attempted to seek relief in federal court and filed a habeas petition on June 29, 2004. (Case No. 04-CV-72305). That case was voluntarily dismissed on January 24, 2005, after which petitioner went back to the state trial court with a motion for relief from judgment, under Mich. Court Rule 6.508(D), on

Report and Recommendation
28 U.S.C. § 2254 Petition
*Jones v. McKee*; Case No. 08-11183

April 14, 2005.  (Dkt. 8-18, pp. 3-4).  That motion was denied on January 9, 2006.

(Dkt. 8-18, pp. 65-70).  On June 26, 2006, petitioner filed an application for leave

to appeal the trial court decision to the Court of Appeals and that request was

denied on December 6, 2006.  (Dkt. 8-18, pp. 7-64; Dkt. 8-18, p. 1).  Petitioner

then filed an application for leave to appeal to the Michigan Supreme Court on

January 11, 2007, and that application was denied on September 10, 2007.  (Dkt. 8-

21, pp. 2-50 and Dkt. 8-22, pp. 1-43; Dkt. 8-21, p. 1).

## IV.    FEDERAL REVIEW

Petitioner filed the present petition under 28 U.S.C. § 2254, which is part of

the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), on March

19, 2008.  (Dkt. 1).  In his petition, fifteen claims are raised: (1) prosecutorial

misconduct regarding the prosecutor's question to witness Ricky Jones relating to a

polygraph examination, (2) insufficiency of the evidence regarding the

premeditation element of the murder conviction, (3) insufficiency of the evidence

regarding the agreement element of the conspiracy charge, (4) error by the court in

admitting the autopsy photographs, (5) ineffective assistance of counsel based on

counsel's failure to object to a statement made by a government witness, (6)

ineffective assistance of counsel based on trial counsel's "opening" the door to the

issue regarding Ricky Jones taking a polygraph, (7) ineffective assistance of

counsel based on counsel's failure to investigate and call certain exculpatory

witnesses, (8) ineffective assistance of counsel based on counsel's failure to offer evidence that the blood-stained green trousers did not fit petitioner, (9) ineffective assistance of counsel based on counsel's failure to object to certain questions petitioner was asked, (10) prosecutorial misconduct based on the prosecutor's deliberate misstatement of the evidence, (11) prosecutorial misconduct based on the prosecutor's rebuttal argument that the defense was trying to mislead the jury, (12) ineffective assistance of counsel based on the failure to request a drug addict instruction, (13) reversible error based on the cumulative effect of the errors committed during the trial, (14) ineffective assistance of appellate counsel based on the failure to raise significant issues on direct appeal, (15) a miscarriage of justice would result from petitioner being barred from asserting certain claims and therefore petitioner need not establish cause and prejudice before the court will consider those claims.

A.    <u>Standard of Review</u>

Under the AEDPA, federal courts have limited authority to grant relief to a state prisoner.  Where a state court has adjudicated the petitioner's claim on the merits, a federal court can only grant a writ of habeas corpus where the state's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  "A federal habeas

court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). "The [federal] court may grant relief under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle from [Supreme Court] decisions but unreasonably applies it to the facts of the particular case." *Id*. "An *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002). The federal writ should not issue just because the "state-court decision applied clearly established federal law erroneously or incorrectly." *Williams v. Taylor*, 529 U.S. 362, 411 (2000). Rather, "the state court's application of clearly established federal law [must have been] objectively unreasonable." *Cone*, 535 U.S. at 694.

Additionally, federal habeas review is barred where the state court finds that the petitioner defaulted the claim pursuant to an independent and adequate state procedural rule "unless the prisoner can demonstrate cause for the default of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

    B.    <u>Polygraph Evidence Issue</u>

Report and Recommendation
28 U.S.C. § 2254 Petition
*Jones v. McKee*; Case No. 08-11183

Petitioner argues that the prosecutor engaged in misconduct during the trial by intentionally introducing evidence about a prosecution witness having taken and passed a polygraph examination.  That claim was raised by petitioner in his direct appeal and decided by the state court on the merits.  While initially the Court of Appeals reversed petitioner's conviction, the Supreme Court reversed the decision of the Court of Appeals and reinstated the conviction.  As noted above, where a state court has adjudicated the petitioner's claim on the merits, a federal court can only grant a writ of habeas corpus where the state's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  Petitioner does not argue that either one of these circumstances exists in the present case and therefore the petition could be denied without further analysis based on petitioner's failure to demonstrate his entitlement to relief under the appropriate standard.

The appropriate standard, in this context, is whether the state court applied the proper Constitutional rule relating to claims of prosecutorial misconduct or, if the proper rule was applied unreasonably.  The Michigan Supreme Court decision as to petitioner's claim of prosecutorial misconduct reflected that "[r]eversal is warranted only when the plain, unpreserved error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness,

integrity, or public reputation of the judicial proceedings independent of the defendant's innocence."  (Dkt. 8-20, p. 79).  That Court concluded that while the prosecutor's introduction of evidence relating to the results of the polygraph examination given to Ricky Jones was improper, the decision to set aside the conviction was influenced by the "invited response" doctrine as defined in *United States v. Young*, 470 U.S. 1 (1985).  In the view of the Michigan Supreme Court, the "invited response" doctrine applied to the circumstances of this case by virtue of the defense attorney bringing up the fact that Jones had been given a polygraph examination, leaving the jury with the impression that Jones had failed the examination.  While not condoning the acknowledged improper conduct of the prosecutor, the Court, citing *Young*, said it was appropriate to consider that conduct in light of the defendant's conduct which prompted the response by the prosecutor.[3]  When the prosecutor's conduct was viewed under the circumstances of the defense attorney's conduct, which motivated the prosecutor's conduct, as well as the "substantial evidence" that corroborated the testimony of Ricky Jones, the Court concluded reversal of the conviction was not necessary because

---

[3] *Young* provides that the misconduct of the prosecutor "must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error.  In other words, the Court must consider the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly.  In this context, defense counsel's conduct, as well as the nature of the prosecutor's response is relevant."  470 U.S. at 12.

petitioner had not demonstrated that the evidence of the polygraph results "was ... outcome-determinative," that is, the evidence had "not affected the outcome of the lower-court proceedings."  (Dkt. 8-20, p. 84).

In addressing a claim of prosecutorial misconduct on habeas review, the "relevant question is ... whether the prosecutor's [conduct] 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Maccias v. Makowski*, 291 F.3d 447, 451 (6th Cir. 2002), quoting, *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  Where the prosecutor's conduct is improper, a due process violation is determined by applying a four-factor test including: (1) whether the conduct of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct was isolated or extensive; (3) whether the conduct was deliberate or accidental; and (4) whether the evidence against the defendant was strong.  *Macias*, 291 F.3d at 452, relying on *United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir. 1994).

This four-part test is essentially the test that the Michigan Supreme Court applied to their decision in the present case.  The Court decided that the prosecutor's conduct did not prejudice petitioner because of the other evidence in the case, also considering the "invited response" doctrine, they did acknowledge that the prosecutor's conduct was intentional and they also found the evidence was strong enough to outweigh any prejudice from the improper conduct under the

circumstances. While the Court did not address the issue regarding the

prosecutor's conduct being isolated or extensive, the trial record reflects only this

one reference, by the prosecutor, to the polygraph examination and there was no

mention of it in the prosecutor's closing argument. The undersigned concludes

that the Michigan Supreme Court applied the correct test to determine if petitioner

was denied his rights under the Due Process Clause and their application of that

test was not "an unreasonable application of clearly established federal law."

*Macias*, 291 F.3d at 454.[4]

    C.    <u>Sufficiency of the Evidence</u>

    As his second and third grounds for relief in this petition, petitioner claims

that there was insufficient evidence of premeditation with respect to his murder

conviction and insufficient evidence of agreement to commit murder or "specific

knowledge of the conspiracy's unlawful purpose to kill with respect to his

conspiracy to murder conviction." Petitioner had raised these same claims in his

direct appeal and the Michigan Court of Appeals found there was sufficient

evidence on these issues. Their decision was the final appellate decision on these

points because the Michigan Supreme Court did not review this aspect of

petitioner's claims. Specifically, the Court of Appeals said

---

[4] The question before a federal court on habeas review "is not whether the
state court's decision was wrong, but whether it was an unreasonable application of
clearly established federal law." *Macias*, 291 F.3d at 454.

> [p]remeditation and deliberation requires sufficient time to allow the defendant to take a 'second look.' *People v. Anderson*, 209 Mich.App. 527, 537; 531 N.W.2d 780 (1995). Viewing the evidence in the light most favorable to the prosecution, *id.*, we conclude that a rational trier of fact could have found beyond a reasonable doubt that defendant had ample time to take a "second look" after being approached by Kim Martin and before repeatedly jumping on the victim's head. Further, there was sufficient evidence that defendant agreed with Martin to murder the victim.

(Dkt. 8-20, p. 4).

Petitioner offers little or no analysis on these claims, but contends the evidence was insufficient to support his convictions. Respondent argues that there is sufficient evidence as to the claims made by petitioner. Respondent points out that under Michigan law, premeditation can be proven through evidence relating to "(1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after the homicide." *People v. Schollaert*, 194 Mich.App. 158; 486 N.W.2d 312 (1992).

The evidence at the trial included testimony that the victim was kicked in the head numerous times over a period of several minutes by Kim Martin until the victim lost consciousness. (Dkt. 8-12, pp. 20-24). Those events played out near petitioner's residence. After attacking the victim as described, Martin went to petitioner's residence and asked petitioner "if he wanted a piece of this," which

was an apparent reference to the beating that Martin had inflicted on the victim. Petitioner left his residence and proceeded to jump on the victim's head, with both feet, as many as five times. (Dkt. 8-12, pp. 25-27). These actions by petitioner took place after petitioner had his television stolen and petitioner believed the victim was the thief. Petitioner vowed to "get" the person who took his television and was going to "hurt" that person. (Dkt. 8-12, pp. 109, 118). Petitioner made these or similar statements to Kim Martin when Martin was at petitioner's residence and Martin stated that items had been stolen from his residence. (Dkt. 8-12, pp. 108-10). This evidence, viewed in the light most favorable to the prosecution, could have allowed a rational trier of fact to conclude that petitioner had time for a "second look" after being invited by Martin to engage in the assault on the victim (the premeditation factor) and that petitioner, in accepting Martin's invitation, agreed with Martin, based on their mutual belief that the victim had stolen property from each of them, to murder the victim through the use of potentially lethal force on an unconscious, and severely injured person. Both Martin and petitioner used potentially lethal force on the victim by administering severe, repeated blows to the victim's head. A rational jury could easily have found that the victim's condition, when observed by petitioner, was such that petitioner would have been aware of the severe beating the victim had received from Martin and that petitioner's conduct in the face of those circumstances

Report and Recommendation
28 U.S.C. § 2254 Petition
*Jones v. McKee*; Case No. 08-11183

demonstrated a shared intent to murder the victim.

The Court of Appeals addressed this issue on the merits and concluded that sufficient evidence of premeditation and conspiracy was presented. The Court applied state law, which provided that the evidence must be viewed in the light most favorable to the prosecution to determine if a rational trier of fact could have found the elements of the offense beyond a reasonable doubt. In applying that standard, the Court followed the rule that the reviewing court must draw all reasonable inferences and resolve credibility conflicts in support of the jury's verdict.

Under the AEDPA, a federal court must determine if the State Court ruling, on the merits of petitioner's claim, resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding. *Mueller v. Bell*, 2008 WL 482278 (6th Cir. 2008).

United States Supreme Court precedent establishes that, to satisfy the due process required to support a criminal conviction, evidence must be presented that could convince a rational trier of fact beyond a reasonable doubt of the existence of every element of the offense. *Jackson v. Virginia*, 443 U.S. 307, 315-16 (1979).

In order to determine whether this constitutional standard has been achieved, a reviewing court must consider the evidence in the light most favorable to the prosecution and decide whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Id.* at 319. While not referring directly to *Jackson v. Virginia*, the state court opinion articulated the *Jackson* standard for sufficiency of the evidence.

Respondent has pointed out that this Court should not weigh the evidence in assessing its sufficiency. "[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson v. Virginia*, 443 U.S. at 326.

A rational trier of fact could very well have concluded, beyond a reasonable doubt, that the petitioner had sufficient time to premeditate before jumping on the victim's head with both feet, repeatedly, and that he accepted Martin's invitation to act in this fashion knowing the grave condition the victim was in, based on Martin's assault, and therefore agreed with Martin and shared Martin's intent to murder the victim. Based on the above analysis, the state court's ruling that there was sufficient evidence was not based on any unreasonable determination of the facts in light of the evidence presented in the trial court. As a result, petitioner has

not demonstrated that any rights he had under the constitution were violated within the parameters of the AEDPA.

    D.    <u>Admission of Photographs</u>

In his fourth claim for relief, petitioner argues he was denied due process through the trial court's decision to admit four photographs, two depicting the victim taken on the day of his attack in August of 1998 and two depicting the victim at the time of the autopsy in January 1999.  The first two photographs, identified as Exhibits 1 and 2, were taken at the scene of the assault by the first responding police officer and showed how the victim "appeared" and how the victim was "located."  (Dkt. 8-11, pp. 81-83).  The second set of photographs, admitted through the testimony of Dr. Virani, the medical examiner, consisted of one photograph showing the deceased victim laying on a table (Ex. 34) and a second photograph showing the head area of the deceased victim (Ex. 35).  (Dkt. 8-13, pp. 5-6).

During the trial, defense counsel objected to all four of the photographs claiming they were "quite gruesome," but conceding that Exhibit 2 was not as bad as the others.  The prosecutor argued that the photographs showed the manner in which the victim was beaten and the extent of the beating received.  Exhibit 1 apparently showed the victim's face area and Exhibit 2 showed the victim's whole body with medical personnel working on him.  (Dkt. 8-11, pp. 59-60).  The defense

argument was that the photographs were more prejudicial than probative and the trial judge overruled the objection and admitted the photographs. *Id*.

Petitioner raised this issue in his direct appeal and the Court of Appeals, after remand from the Michigan Supreme Court, addressed the claim on the merits in a decision entered on August 19, 2003. In upholding the decision of the trial court to admit the photographs, the Court of Appeals said the "photographs were relevant regarding defendant's intent and were instructive on the nature and extent of the victim's injuries. The exhibits tended to prove that defendant did not merely intend to harm the victim but intended to kill [him]." The Court then noted that the probative value was not substantially outweighed by the danger of unfair prejudice "because the nature of the crime was vicious and the jury needed to view the photographs to determine the specific intent."

Petitioner argues in the present petition that "the trial court abused its discretion by allowing the jury to view the nature and extent of the victim's injuries rather than to rely solely on the testimony of witnesses at trial." (Dkt. 3, p. 44). Respondent contends that the "role of a federal habeas court is not to pass upon the correctness of the trial court's evidentiary rulings, but rather is limited to determining whether the rulings denied Petitioner a constitutionally guaranteed right." (Dkt. 7, p. 19).

A state court's application of its own evidentiary rules, unless fundamentally

unfair, does not violate the U.S. Constitution. *Wynne v. Renico*, 606 F.3d 867, 871

(6th Cir. 2010).  Even if the state court did incorrectly apply Michigan rules of

evidence, that error provides no basis for habeas relief.  *Railey v. Webb*, 540 F.3d

393, 398 (6th Cir. 2008).  In the present case, the trial court admitted a total of four

photographs, two showed an alive but gravely injured victim and the other two

showed the same individual, after he had died.[5]  While the photographs were

graphic, there is no evidence indicating that they did not accurately portray the

injuries suffered by the victim in this case, which were important to demonstrate,

as noted by the Michigan Court of Appeals, the nature and extent of the injuries

which was relevant to issues associated with petitioner's knowledge and intent.

The decision of the trial judge to admit the photographs was not an abuse of

discretion and, even if it was so under state law, it was clearly not fundamentally

unfair such that petitioner was denied due process.

     E.    <u>Remaining Issues</u>

All of the remaining claims raised by petitioner were claims that were not

considered by the state court for procedural reasons.  Respondent contends that

petitioner's claims are barred in this Court because there was an independent and

---

[5] Petitioner alleges that the pictures showed a "grossly dismembered body" but there is no evidence in this record to indicate the pictures depicted a dismembered body.  Neither the arguments of counsel or the testimony of the witnesses suggest that there was any dismemberment reflected in the pictures.

adequate state procedural rule that was applied to deny relief in the state court. Respondent, in his reply, does not contest that he was barred from raising these issues in state court, but contends that he was denied the opportunity to raise the claims based on the ineffectiveness of appellate counsel and that he should be relieved of this limitation because he is actually innocent of the charges he was convicted of.  (Dkt. 9, pp. 10-11).

Federal habeas law clearly denies a petitioner the opportunity to have a claim considered in federal court where the petitioner has defaulted on that claim in state court and a state court procedural rule prevents the issue from being addressed on the merits in state appellate review.  *Colemanv.Thompson, supra*. However, a habeas petitioner may be able to demonstrate cause to disregard the state procedural rule and actual prejudice resulting from the alleged constitutional error.  *Bowling v Parker*, 344 F.3d 487, 497 (6th Cir. 2003).  Ineffective assistance can be cause if it is constitutionally ineffective assistance as defined in *Strickland v Washington*, 466 U.S. 668 (1984).  Here, petitioner claims ineffective assistance with respect to his attorney on direct appeal.  (Dkt. 9, p. 10).

"In order to succeed on a claim of ineffective assistance of appellate counsel, a petitioner must show errors so serious that counsel was scarcely functioning as counsel at all and that those errors undermine the reliability of the defendant's convictions. ... Strategic choices by counsel, while not necessarily those a federal

judge in hindsight might make, do not rise to the level of a Sixth Amendment violation." *McMeans v. Brigano*, 228 F.3d 674, 682 (6th Cir. 2000). The trial judge, on petitioner's motion for relief from judgment, stated: "The record reflects that Defendant was provided with experienced appellate counsel who selected and argued four primary points of error on behalf of defendant. This decision to drop the weak arguments raised by Defendant in the instant Motion was well within the attorney's discretion to make strategic decisions. Further evidence of appellate counsel's effectiveness is borne out by the fact that the Court of Appeals granted a new trial even though our Supreme Court would ultimately reverse that decision." (Dkt. 3-2, pp. 21-26). The undersigned agrees with the trial judge's analysis with respect to the performance of appellate counsel. The failure to include the issues petitioner has identified does not demonstrate anything more than the standard kind of strategic choice an appellate attorney makes to emphasize the strongest issues and disregard weak issues for fear that the weak issues will detract from the persuasiveness of the stronger claims. Further, in order to show a *Strickland* violation, prejudice must be established in addition to a deficient performance. That is, a petitioner must show there is a reasonable probability that, but for the attorney's deficient performance, the outcome of the proceedings would have been different. *Strickland*, 466 U.S. at 694. Petitioner has not demonstrated here that there is a reasonable probability that, even if his counsel's performance had been

Report and Recommendation
28 U.S.C. § 2254 Petition
*Jones v. McKee*; Case No. 08-11183

found to be deficient, the result of the appeal would have been any different.

A second alternative for a habeas petitioner to avoid this procedural bar is a miscarriage-of-justice exception. "In appropriate cases ... the principles of comity and finality that inform the concepts of cause and prejudice ' must yield to the imperative of correcting a fundamentally unjust incarceration.'" *Murray v. Carrier*, 477 U.S. 478, 495 (1986), quoting, *Engle v. Isaac*, 456 U.S. 107, 135 (1982). "[P]risoners asserting innocence as a gateway to defaulted claims must establish that in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House v. Bell*, 547 U.S. 518, 536-37 (2006), quoting, *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

Petitioner claims to come within the actual innocence gateway, which he contends should excuse his default and allow consideration of the merits of his defaulted claims. In support of this argument, petitioner recites evidence from the trial which petitioner believes discredits prosecution witness Ricky Jones. (Dkt. 3-2, pp. 10-12).[6] The only new factual information submitted by petitioner is that just prior to his testimony in the trial, he tried on the blood soaked trousers that

---

[6] In his argument on this issue, petitioner incorrectly claims the trial evidence indicates that Ricky Jones failed a polygraph test. A review of the record does not include that fact. The record does indicate that Jones passed a polygraph. (Dkt. 8-12, pp. 33-34).

contained DNA from the victim and the trousers did not fit.  (Dkt. 3-2, pp. 11-12).
Petitioner relies on this factual representation in support of his actual innocence
claim.

Respondent's response to petitioner's argument on this issue was to point
out the need for petitioner to demonstrate factual innocence and included the
following quote from *Schlup*, 513 U.S. at 316:  "without any new evidence of
innocence, even the existence of a concededly meritorious constitutional violation
is not in itself sufficient to establish a miscarriage of justice that would allow a
habeas court to reach the merits of a barred claim."  (Dkt. 7, p. 24).  While
petitioner filed a reply to the response no additional factual information was
presented.  (Dkt. 9, pp. 10-11).

"'To be credible' a gateway claim requires 'new reliable evidence-whether it
be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical
physical evidence - that was not presented at trial.'"  *House*, 547 U.S. at 537,
quoting, *Schlup*, 513 U.S. at 324.  However, "*Schlup* makes plain that the habeas
court must consider 'all the evidence,' old and new, incriminating and exculpatory,
without regard to whether it would necessarily be admitted under 'rules of
admissibility that would govern at trial.'"  *House*, 547 U.S. at 538, quoting, *Schlup*,
513 U.S. at 327-28.  "A petitioner's burden at the gateway stage is to demonstrate
that more likely than not, in light of the new evidence, no reasonable juror would

find him guilty beyond a reasonable doubt - or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 538. The analysis a court must conduct under these circumstances may involve the credibility of witnesses. *Id*. at 539. The standard here is very high and only permits review in an "extraordinary" case. *Id*. at 538.

The only "new" evidence petitioner proffers is the claim that the blood soaked trousers did not fit him when he tried them on just before his testimony. Given petitioner's self-interest in this matter, his credibility regarding these facts is not very high. Additionally, such evidence is contradicted by the trial evidence that these trousers belonged to petitioner. Petitioner admitted as such during his testimony and (Dkt. 8-16, p. 34) and Julie Pryor also testified that the trousers belonged to him. (Dkt. 8-12, p. 113). Based on this analysis, petitioner has not met his burden to show it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt.

Based on the foregoing, the Michigan court did not make a decision regarding petitioner's case that was contrary to, or that was an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court.

## V.    RECOMMENDATION

Based on the foregoing, the undersigned **RECOMMENDS** that the Court

**DENY** the petition for relief under 28 U.S.C. § 2254.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may

rule without awaiting the response.

Date: March 14, 2011                        s/Michael Hluchaniuk
                                            Michael Hluchaniuk
                                            United States Magistrate Judge

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 14, 2011. I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to the following: <u>Laura A. Cook</u>, and I certify that I have mailed by United States Postal Service the paper to the following non-ECF participant(s) at the following addresses*: <u>Jonathan Joe Jones, #121447, BELLAMY CREEK CORRECTIONAL FACILITY, 1727 West Bluewater Highway, Ionia, MI 48846, and Jonathan Joe Jones, #121447, NEWBERRY CORRECTIONAL FACILITY, 3001 Newberry Avenue, Newberry, MI 49868</u>. *The court docket reflects that the plaintiff's address is the BELLAMY CREEK CORRECTIONAL FACILITY. However, a check with the Michigan Department of Corrections prisoner tracking system indicates that the plaintiff is currently located at the NEWBERRY CORRECTIONAL FACILITY.

s/Tammy Hallwood

Case Manager

(810) 341-7888

tammy_hallwood@mied.uscourts.gov
